CASE 39—PETITION EQUITY—JULY 6.

# Middleton, &c., vs. Hoge, &c.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. Mere misrepresentation of value is not, under ordinary circumstances, a vitiating fraud.

2. The law not only allows infants to avoid most of their contracts, but assumes that contracts, not equal and beneficial to them, were procured by fraud. This is constructive fraud, whether there was a fraudulent intent or not; but this *prima facie* imputation of fraud may be repelled by proof of reciprocity and commensurable consideration, and by the absence of any false suggestion or delusive suppression.

3. In this case it is held, that infancy did not entitle the plaintiff to an avoidance of his contract for the land.

1. Because, long after his majority, he put it out of his power to restore the title.

2. Because he confirmed his purchase—

*First.* By his recorded deed, proclaiming his mother as the true and only owner of the land; and,

*Second.* By his continued use of it as her property, held for his benefit.

*Third.* By never offering an avoidance or rescission.

*Fourth.* By his sale to another party.

*Fifth.* By suing for damages for an alleged· fraud, and therefore waiving an avoidance on the plea of infancy.

4. A voidable purchase of property by an infant may be confirmed by acts which might not confirm a sale by him; and a sale might be confirmed by acts which would not confirm a promise, and for obvious reasons—

5. Less will be required for the confirmation of executed than executory contracts by infants. (*See opinion for list of authorities.*)

6. An infant purchased and paid two thousand dollars in "greenbacks" for a lot of corn, and consumed it during his minority. In his suit to avoid the contract, the proof showing that the corn was worth

but twelve hundred dollars at the date of the purchase, he is entitled to recovor eight hundred dollars of his vendor, with interest from the date of his payment, payable in "greenbacks."

MUIR & BIJUR,
GIBSON & FOX,
O. F. STIRMAN,
BARRETT & ROBERTS, and
M. C. JOHNSON,                          For Appellants,

CITED—

1 *Dana*, 612 ; *Marshall vs. Peck.*

5 *Mon.*, 353 ; *Phillips vs. Green.*

2 *Dana*, 45 ; *Deacon vs. Boyd.*

4 *Met.*, 310 ; *Stearn vs. Freeman.*

*Tyler on Infancy and Coverture, pp.* 80, 81, 82, 87.

33 *N. Y. Rep.*, 526 ; *Henry vs. Root.*

9 *Metc.* (*Mass.*), 519 ; *Boyden vs. Boyden.*

23 *Maine*, 519 ; *Boody vs. McKinney.*

6 *Conn.*, 494 ; *Blaine vs. Bube.*

3 *Vermont*, 353 ; *Bigelow vs. Kinney.*

11 *Wend.*, 85 ; *Delano vs. Blake.*

1 *Dana*, 45 ; *Deason vs. Boyd.*

8 *Greenleaf*, 405 ; *Lawson vs. Lovejoy.*

1 *Pickering*, 221 ; *Barnaby vs. Barnaby.*

*Bing. on Infancy, pp.* 64, 65.

8 *N. Y.*, 228 ; *Jones vs. The Phœnix Bank.*

*Story on Contracts*, 72, *sec.* 69.

10 *Peters*, 75 ; *Tucker vs. Morland.*

11 *Johnson*, 542 ; *Johnson vs. Carpenter.*

2 *Moore's R.*, 552 ; *Holmes vs. Blogg.*

*Civil Code, sec.* 786 ; *Co. Litt.*, 51 *b.*

3 *J. J. Mar.*, 120 ; 5 *J. J. Mar.*, 68.

5 *J. J. Mar.*, 285 ; 6 *Dana*, 336.

1 *Dana*, 419 ; 6 *Mon.*, 398.

5 *Yerg. Tenn. Rep.*; *Wharton vs. East.*

2 *Vern.*, 225 ; *Cecil, &c., vs. Salisbury.*

*Kelsey's case, Croke, James*, 320.

*Comyn's Digest, Infant, chap.* 3, *vol.* 3, 164 ; 1 *Roll. Ab.*, 731.

9 *Viner, Infant* (*R.*), *page* 408 ; *pl.* 2, *pl.* 8.

2 *Kent*, 273.

1 *J. J. M.*, 255 ; *Breckinridge vs. Ormsby.*

*Bac. Abr., title Infant.*

15 *Mass.*, 220 ; *Gelb. Tenn.*, 75.

*Reeves' Dom. Rel.*, 240 ; 4 *Leonard*, 3.

1 *Maine*, 11 ; *Hubbard, &c., vs. Cummins.*

1 *New Hamp.*, 73 ; *Roberts vs. Wiggin.*

15 *Mass.*, 22 ; *Boston Bank vs. Chamberlin, &c.*

1 *Parsons on Contracts*, 5 *edn.*, 322, 325.

4 *McCord*, 241 ; *Cheshire vs. Barret.*

*Metcalfe on Contracts*, 59.

11 *Serg. & Rawle's Rep.*, 311 ; *Austin vs. Patton.*


William T. Ward,

Harlan & Newman,

J. H. Ward, and

O. T. Ward,                                For Appellees,

CITED—

1 *Story's Equity Jur., sec.* 222–228, *inclusive.*

1 *Story's Equity Jur., sec.* 234–238, *inclusive.*

1 *Story's Equity Jur., sec.* 240–248, *inclusive.*

*Chitty on Contracts, page* 148.

3 *Vermont*, 353 ; *Biglow & Kennedy.*

2 *Littell*, 157 ; *Williams vs. Narrio.*

5 *Snead & Marsh*, 216 ; *Hill vs. Adams.*

2 *Humphreys*, 27 ; *Grace & Hale.*

5 *Humphreys*, 70 ; *Smith vs. Evans.*

15 *Mass.*, 359 ; *Badger vs. Fanning.*

7 *Hill*, 110 ; *Medbearry vs. Walter.*

CONFIRMATION.

2 *Hill*, 120; *Biglow vs. Gramis.*

6 *N. Hamp.*, 432; *Mariam vs. Wilkins.*

3 *Wend.*, 403; *Goodwell vs. Meyers.*

4 *Wend.*, 301, 302; *Gay vs. Ballon.*

4 *Day*, 57; *Rogers vs. Hard.*

6 *Conn.*, 494; *Kline vs. Beebe.*

11 *Mass.*, 146, note (*s*); *Jackson vs. Mayo.*

1 *Pck.*, 202; *Ford vs. Phillips.*

4 *Pck.*, 48; *Thompson vs. Lay.*

1 *Pck.*, 221; *Barnaby vs. Barnaby.*

3 *N. Hamp.*, 314; *Orois vs. Kimball.*

8 *N. Hamp.*, 374; *Hale vs. Gancit.*

12 *Conn.*, 550; *Wilcox vs. Roath.*

2 *Hawks*, 535; *Alexander vs. Hutcheson.*

5 *Metcalf*, 168; *Pierce vs. Toby.*

9 *N. Hamp.*, 436; *Hoyt vs. Hill.*

4 *N. Hamp.*, 441; *Dearborn vs. Eastman.*

14 *Johnson*, 124; *Jackson vs. Burchin.*

9 *Mo.*, 447, 473; *Clomargin vs. Swan.*

10 *Peters*, 75, 76; *Tucker vs. Monland.*

11 *Johnson*, 542, 543; *Jackson vs. Carpenter.*

10 *Bingham*, 252; *Coope vs. Overton.*

25 *Eng. C. L.*, 121; *Coope vs. Overton.*

1 *Greenleaf*, 42; *Hubbard vs. Cummings.*

*Tyler on Infants, sec. 50, page 96.*

*Tyler on Infants, latter part of sec. 43, p. 83.*

*Story on Contracts, 2d ed., sec. 57.*

23 *Me.*, 517 to 74; *Moody vs. McKinley.*

*Tyler on Infants, page 83.*

*Biglow vs. Kinney*, 353–59.

10 *N. Hamp.*, 562–66; *Robbins vs. Eaton.*

*Chitty on Contracts, s. p. 146.*

1 *Parsons on Contracts*, 323.

5 *Esp.*, 102; *Harmer vs. Killing*.

26 *Eng. Law and Eq. R.*, 553; *Mawsow vs. Blane*.

1 *Parsons on Bills and Notes*, p. 77.

3 *Richardson's Law Rep.*, 168; *Norris vs. Vance*.

16 *Maine*, 57; *Thing vs. Libbcy*.

9 *Mass.*, 62; *Smith vs. Mayo*, &c.

*Mcigs' Rep.*, 175; *Caplinger vs. Stokes*.

18 *Barb.*, 322; *Taft vs. Leagt*.

2 *Dev. & Battle*, 320; *Hoyle vs. Stowe*.

1 *B. Mon.*, 289; *Crabtree vs. May*.

7 *Dana*, 521; *Myers vs. Sanders*.

4 *Dana*, 632; *Irvine vs. McDowell*.

*McPherson on Infants, Law Lib.*, 41st vol., p. 486.

11 *B. Mon.*, 115; *Bailey vs. Bamberger*.

3 *Dana*, 255–6; *Bright & Taylor vs. Waggle & Elkins*.

3 *Dana*, 373; *Blake vs. Shreve*.

3 *Dana*, 509; *Greenwade vs. Greenwade*.

2 *Bibb.*, 38; *Chenoweth vs. Wade*.

1 *Bibb.*, —; *Ballinger vs. Worley*.

*Tyler on Infancy*, pp. 83, 75, 77, sec. 37, pp. 76, 96.

6 *Gray*, 453; *Egerton vs. Wolf*.

5 *Dana*, 525; *Hayden vs. Blackerby and wife*.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT, CHIEF JUSTICE WILLIAMS AND JUDGE HARDIN CONCURRING, JUDGE PETERS DISSENTING:

W. McKay Hoge, born November 14, 1844, in Wheeling, Virginia, without patrimonial estate or expectancy, was engaged as a clerk in the Quarter-Master's Department at Nashville, in the spring and early summer of the year 1864, and threatening to expose extensive swindling against the Federal Government, received for "hush money" as much probably as twenty thousand dollars in United States Treasury notes.

About that time Henry C. Middleton, then owning and residing on a rich farm of about six hundred acres, expensively and tastefully improved, on the road from Pleasureville to Newcastle, in Henry county, Kentucky, visited Nashville and became acquainted with Hoge, who told him that he desired to invest his "greenbacks" in a mercantile firm in Louisville, and was advised by him to do so. Early in August, 1864, Hoge, having come to Louisville for that ostensible purpose, was invited to Middleton's about the 13th of that month, and while there as his guest bought one hundred acres of his farm, including the improvements, all near the center of the tract, for twenty-two thousand dollars, advancing fifteen thousand dollars in the paper currency, and giving his note for seven thousand dollars, payable in six years, with interest; and also bought, for two thousand dollars, advanced in the like currency, about forty-two and a half acres of growing corn.

The bargain was concluded, the seventeen thousand dollars paid, and Middleton's bond for a title to the land executed on the 20th of August, 1864; but Hoge then being a minor, Middleton seems to have considered the sale incomplete and precarious unless Hoge's mother, then a widow, should approve the arrangement and become a substituted party, and whom they visited in September, 1864, and then consulted. Middleton told her that he had sold the land to her son for thirteen thousand dollars, of which six thousand dollars were paid in cash, and seven thousand dollars secured by note, on six years' credit. On her expression of surprise that her son could pay so much, Middleton told her how, as before suggested, he had gotten the money, and Hoge tacitly concurred, and thus confirmed that statement; whereupon, his mother seemed to approve the contract,

and agreed to be substituted as the ostensible purchaser, and to give her note for the unpaid consideration; but whether any written memorial of that agreement was then made, does not appear. At that time, fifteen thousand dollars in the paper currency, as advanced, were worth only six thousand dollars in money; and, therefore, in the essential sense, Middleton had received only six thousand dollars on account of the land; and, as proved by her deposition, Mrs. Hoge was acquainted with the literal fact that the actual advance was nominally fifteen thousand dollars in paper; so that she was not deceived by the statement that six thousand dollars "in cash" had been paid.

Middleton gathered and cribbed the corn for Hoge, and saved and shocked the fodder on the ground; and about the 1st of January, 1865, he delivered possession of all the property sold to Hoge, whose mother came and occupied the premises with him April the 1st, 1865, when Middleton delivered a conveyance of the legal title to her, and which, either then or afterwards, was ante-dated, so as to synchronize with the date of the initial agreement between him and her son; but an obvious erasure rather indicates that the substituted date was inserted after the delivery; and if so, the presumption would be that the alteration was made by her son as an expedient for protecting the property in her name as original and sole purchaser, so as to secure to himself the beneficial use against his creditors, and against the government if it should seek reclamation. He was then still a minor; but on the 8th day of January, 1866, after he had attained majority, he executed and had recorded a deed recognizing his mother's title, and declaring himself her agent, manager, and co-occupant only.

Not long before he became twenty-one years old, he rejected an offer by Middleton to rescind the contract for the land. And although, after he was *sui juris*, he made repeated efforts to sell it, yet he often declared that Middleton should not have it back for less ' than thirty-five thousand dollars.

He and his mother, after cultivating two crops on it, sold and she conveyed it to John Middleton, a son of H. C. Middleton, for thirteen thousand dollars, paid in money, and her note to his father, which he bought from him. And John Middleton took possession of the farm, and has ever since lived on it, and cultivated it as his own.

On the 4th of March, 1867, W. McKay Hoge filed a petition ordinary against H. C. Middleton, alleging that when he bought the land it was not worth more than about half of the price extorted for it—charging that Middleton knew that fact, and fraudulently affirmed that it. was worth twenty-two thousand dollars, and *seeking judgment for damages for the imputed fraud*. That petition virtually waived an avoidance of sale on the ground of infancy.

An amended petition, more minute in the detail of facts, alleged the infancy, *not for avoidance, but only as an evidence of imposition and fraud*. And Middleton's answer controverted all the material allegations conducing to show undue advantage or fraudulent misrepresentation.

A second amended petition, substantially like the first in its charges, sought a rescission on the ground of infancy; and the case being transferred to equity, was heard without any other reply to that amendment than what was contained in the answer to the same allegations, *in effect*, in the first amendment, including the

charge that the land was bought for the appellant by his son John.

John Middleton was finally made a party, and charged with buying the land with his father's means, and as his agent; all of which he traversed by his answer. And the facts in relation to that matter conduce to show that John Middleton, against his father's will, bought the land for his own use and with his own funds, which were, and had long been, on deposit in his own name, and were ample for that end; and every semblance to the contrary is sufficiently denied and explained.

A careful analysis of the multifarious pleadings, voluminous depositions, and all the exhibits, judicially establishes the foregoing as the essential facts of the case.

The chancellor, assuming that the conveyance to John Middleton operated as a rescission of the sale by H. C. Middleton, adjudged against said H. C. Middleton, in favor of W. McKay Hoge, eleven thousand six hundred and seven dollars, the balance of the seventeen thousand dollars advanced for the land and corn, after deducting rents and the five thousand dollars paid by John Middleton, and two hundred and eighty dollars, at which he estimated the corn, delivered.

As John Middleton's title is unaffected by the decree, and he may, therefore, and propably will, hold the land, his father, by this decree, gets only five thousand dollars, instead of twenty-two thousand dollars, for it; and if—as he might and probably would—Hoge should enforce his judgment by the exaction of its amount in money, H. C. Middleton might lose his land, and get nothing for it. This seems to be improvident and inequitable.

On the face of the record, W. McKay Hoge, invoking the aid of a court of equity, certainly stands, with such a decree in his hands, in an unbecoming and graceless

attitude, exposed to a retorted charge of fraud on his creditor, whose judgment General Whitaker, as counsel, was trying to enforce; and of meditated fraud on the Government, and also on the vendor he charged with a fraud, which may seem to recoil on himself. Why else was the title made to his mother? and why else, after rejecting an overture for rescission, and after becoming twenty-one years old, did he write *and record* a false document; intended to show that he had no beneficial interest in the land? And why else, after publishing that he would not resell to his vendor for less than thirty-five thousand dollars, did he sell to his son for only thirteen thousand dollars?

Such is, but too often, the result of an adventurous and perverted spirit of litigation; and a thorough analysis of the facts exhibited in this large record strongly inclines to the conclusion, that whatever semblance of cause there may be for the outcry of fraud raised against the appellant, the appellee himself is apparently more obnoxious to the same imputation, and ought not to have gone into equity for an investigation of the conduct of the parties, or for unconscientious relief. Waiving several preliminary objections to the decree sought to be reversed by this appeal, we shall consider, in reference to the land, only the questions of fraud, of infancy, and of confirmation.

1. Fraud, as charged, has not been established as between competent parties to a contract. A mere misrepresentation of value is not, under ordinary circumstances, a vitiating fraud in the judgment of remedial law.

But to protect inexperienced and confiding infancy against unjust advantage, often taken of such immaturity, the law not only allows infants to avoid most of their contracts, but assumes that contracts, not equal

and beneficial to them, were procured by the fraud of the adult parties; and this is constructive fraud, whether there was a fraudulent intent or not. But this *prima facie* imputation of fraud may in this, as in other classes of cases of constructive fraud, be repelled by proof of reciprocity and commensurable consideration, and by the absence of any false suggestion or delusive suppression.

In this case, according to the legal test, actual fraud is not established, and constructive fraud is disproved, so far as the land is concerned.

It is evident that the parties intended that the note for seven thousand dollars should be payable in paper currency, like that with which the fifteen thousand dollars were paid; and, in that character, it was transferred by the appellant to his son John, and by him canceled by its exchange with the appellee and his mother for the land they sold to him. We shall, therefore, consider the whole consideration of twenty-two thousand dollars as depreciated paper currency, which, on the 20th of August, 1864, was as low as two hundred and fifty dollars in Treasury notes for one hundred dollars in coin. The fifteen thousand dollars advanced on that day were then worth only six thousand dollars in gold. At the date of the sale to John Middleton, that currency had risen to one hundred and forty dollars for one hundred dollars in gold. So that, if the note be considered, the appellee got more of gold value for the land, by about twenty-five hundred dollars, than he gave. Before he bought he seemed apprehensive of continuing depreciation indefinitely; and was, therefore, anxious to convert what he had into something safer and less liable to fluctuation; and, had he not invested it in land, he would probably have exchanged it for gold. Had he made that exchange, he would have gotten no more for his fifteen

thousand dollars than six thousand dollars in money, and that fund yielded him more than six thousand dollars of money value in the sale to John Middleton. He therefore lost nothing by the acts of the appellant, and if he did, it was his own fault, and not appellant's.

Fourteen witnesses testified as to the vendible value of the land in August, 1864; and nine of them, who were respectable and intelligent neighbors, concurred in the opinion that it was worth, at least, twenty-two thousand dollars; and the other five, apparently not duly appreciating the accessory value of such improvements, estimated the value of the land, as sold, at from eight thousand dollars to fifteen thousand dollars. A proper analysis of the facts and reasons disclosed by all the fourteen witnesses, shows a decided preponderance, intrinsic as well as numerical, in favor of twenty-two thousand dollars as the value, and especially to the appellant, who, by such a sale, dislocated his entire tract, and divided the unsold portion into two unimproved fragments.

It thus sufficiently appears, that, in representing the land as worth twenty-two thousand dollars, the appellant had good reason to believe, and should be presumed to have believed, that the representation was true; and, consequently, that statement cannot be deemed a fraud on infancy; and that being the only imputed fraud, the charge of fraud is not sustained.

2. Infancy cannot entitle the appellee to an avoidance of the contract with the appellant for the land—1st. Because, long after his majority, he put it out of his power to restore the title; and 2d. Because he confirmed the purchase from the appellant—1st. By his recorded deed, proclaiming his mother as the true and only owner of the land; 2d. By his continued use of it as her prop-

erty, held for his benefit; 3d. By never offering an avoidance or rescission, and instead of ever intimating to the appellant any such purpose or wish, striving repeatedly to sell to some other person; 4th. By his sale to John Middleton for thirteen thousand dollars, after declaring that his father should not have it for less than thirty-five thousand dollars; and 5th. By suing for damages for an alleged fraud, and therefore waiving an avoidance on the plea of infancy.

All these cumulative evidences of confirmation cannot be eluded by the pretense that the appellee was ignorant of his right to avoid. He certainly knew all the facts, and must be presumed to have known that his purchase was, by law, voidable; and, instead of implying his ignorance of his rights, his suggestion to Gen. Whitaker that the appellant had been advised by counsel that the contract could not then be avoided, imports that he also had considered that question and consulted about it; and it is quite manifest, that as Whitaker's object was to find an interest which he might subject to his client's execution against the appellee, the object of the latter was to convince him that he had no available interest in the land, and that the whole interest, legal and beneficial, in the land, was, in good faith, irrevocably in his mother; and this shows how ingenuously he had managed the whole affair, and how well he understood the entire subject, and all his rights.

A voidable purchase of property by an infant may be confirmed by acts which might not confirm a sale by him; and a sale might be confirmed by acts which would not confirm a promise; and, for obvious reasons, less will be required for the confirmation of executed than executory contracts by infants. All this is established by abundant authority and palpable reason, as

a careful collation and analysis of the following authorities will show: 1 *Story's Equity Jur.*, secs. 195, 196, 200; 2 *Kent's Com.*, pp. 645, 273; *Reeve's Dom. Rel.*, 240; *Comstock's Digest*, title "*Infancy*"; *Parsons on Con.*, 322–25; *Breckinridge vs. Ormsby*, 1 *J. J. Mar.*, 255; *Delano vs. Blake*, 11 *Wendell*, 85; *Henry vs. Root*, 33 *N. Y. R.*, 526; *Hally vs. Wharton*, 11 *Adal. & Ellis*, 934; *Philips vs. Green*, 5 *Mon.*, 353; *Deacon vs. Boyd, &c.*, 1 *Dana*, 45; *Sanford vs. Farmers' Bank*, 1 *Bush*, 336; *Pepper & Watson vs. Aiken*, 2 *Bush*, 252; *Wharton vs. East*, 5 *Yerger's Tennessee Reports.* And if, according to these texts, the sale of the land to the appellee was not understandingly and conclusively confirmed by his conduct after he was twenty-one years old, we could scarcely imagine what other facts would presumptively amount to such confirmation of such a purchase. We therefore adjudge that the *locus poenitentiæ* has been supplanted by confirmation, and that, as to the land, the chancellor's decree is erroneous, and must be reversed.

But as to the corn, which was probably consumed during infancy, and respecting which there may not have been any binding confirmation, the judgment of this court is essentially different. The corn, when sold, was not worth two thousand dollars, according to the testimony, carefully analysed and weighed. It was worth to the appellee only about one thousand two hundred dollars; and if infancy and exorbitance of price should avoid the sale as constructively fraudulent, the appellee should be charged with the value of the corn which he consumed; and, therefore, he is not entitled to restitution of more than eight hundred dollars in the currency in which he paid the two thousand dollars for the corn. And to that extent he is apparently entitled to equitable relief.

We therefore adjudge that the appellant make restitution to the appellee of eight hundred dollars in treasury notes of the United States, as paid for the corn, and legal interest thereon from the 20th of August, 1864, when the corn was paid for.

Wherefore, Judge PETERS dissenting, the chancellor's decree is reversed, and the case remanded, with instructions to decree the restitution of the eight hundred dollars, and interest in kind, as just indicated, and then to dismiss the appellees' petition.

———

JUDGE PETERS DELIVERED THE FOLLOWING AS HIS DISSENTING OPINION:

Being unable to concur in opinion with the majority of the court in this case, I present the following reasons for dissenting therefrom:

In the summer of 1864, the appellee, William McKay Hoge, a native of Wheeling, Virginia, and then under twenty-one years of age, arrived in Louisville, Kentucky, possessed of a very large amount of means in United States Treasury notes for one of his age; and the only evidence of how he acquired them, furnished in this record, is found in an answer of his mother, Mrs. Mary Hoge, to an interrogatory propounded to her by appellants, in which she states, that at her house in Wheeling, Virginia, in September, 1864, Mr. H. C. Middleton told her that her son had discovered some fraudulent transactions in the Quartermaster's Department in Nashville, Tennessee, and the parties to the fraudulent transactions had paid her son money to keep the "*matter quiet;*" and she understood from H. C. Middleton that the money so acquired was the money with which (my) her son had paid H. C. Middleton for the farm.

Wm. McKay Hoge and H. C. Middleton were acquaintances, which acquaintance was formed before the former arrived in Louisville, as is alleged by Hoge in an amended petition, and not denied by Middleton. Very soon thereafter they became friends, and Hoge was the guest of Middleton at his home in Henry county.

On the 20th of August, 1864, while at his house, and still a minor, as Hoge alleges, Middleton sold to him one hundred acres of his land, at the price of twenty-two thousand dollars, and a field of corn on the land, at the price of two thousand dollars. For the land, he paid fifteen thousand dollars down, in United States Treasury notes, and executed his note for seven thousand dollars, the residue of the price, due six years from date, and paid the two thousand dollars down for the corn in currency.

He further alleges, that at the date of the sale the land was not worth more than seven thousand dollars or eight thousand dollars, and the corn not more than seven hundred and fifty dollars; that he was seduced into the agreement for the purchase of the land and corn by the undue influence that Middleton had acquired over him, by his professions of friendship for him, by his (Hoge's) lonely condition in the country, having no acquaintances but Middleton and his family, and by the false representations of Middleton that the land and corn were worth the prices which he asked and had fixed on them, for the fraudulent purpose of imposing on his non-age and want of experience, and, finally, succeeded in selling him the land and corn at prices greatly beyond their fair value; and for the causes alleged prays for a rescission of the contract on equitable principles.

H. C. Middleton, in the most explicit and positive terms, denies in his answer that he ever sold land or corn to said Wm. McKay Hoge, and denies that he ever received *any money from him upon any sale*, or upon any contract to sell any land or corn to him ; avers that said Hoge applied to him to sell him the land and corn, but that he declined to make any sale to him, because he was then a minor ; and Hoge then informed him that his mother would purchase them from him, and that he then, at Hoge's request, went with him to his mother's, in Wheeling, Virginia, and there sold her the land at the price of twenty-two thousand dollars, of which sum fifteen thousand dollars were paid in hand, and for seven thousand dollars, the residue of the purchase price, Mrs. Hoge executed to him her note, and thereupon he executed to her a deed.

He denies that he made any misrepresentations in regard to the land or its value ; alleges that, since he conveyed the land to Mrs. Hoge, she has sold and conveyed it to John Middleton, who was at that time in possession, and exhibits his deed to Mrs. Hoge and her deed to John Middleton. But he fails to aver, in his original answer, or in an amended one, which he subsequently filed, consisting of twenty-one paragraphs, that he sold any corn whatever to Mrs. Hoge, or that he ever received a cent for corn, although he most emphatically denied he sold any to her son, W. McKay Hoge—resting upon his denial that he had, by his influence, induced William McKay Hoge to buy the land or the growing crop, and upon his denial that they were not worth the price at which he sold them. Finally, he insists, that *if* it *should be made to appear* that he had contracted to sell the land and corn to young Hoge, while he was an infant, that after he arrived at full age he had, by various open and

distinct acts, ratified and confirmed his purchase: one of which acts of ratification, as described by appellant, might not be uninteresting to the curious, and may, therefore, be inserted. That he, Middleton, went to *Mrs. Hoge*, and tendered a rescission of the contract *to her*, after her son was twenty-one years of age; but that he gave it out, in speeches in the presence of those who he knew would repeat what he said to appellant, that he should not have the land back, even if he would give thirty-five thousand dollars for it; and having heard what the son said, he made other arrangements. Instead of detailing the rumors he had heard, why did he not state the reply of Mrs. Hoge to his proposition to take the land back? It was made to her, as he says, and she held the legal title. It may be that her reply corresponded with that part of her deposition in which she states: "I know my son wished H. C. Middleton to take the farm back, and to give to my son back his money, both before he was of age and since he is of age. I believe he did not desire or wish to take one third of the money back, and give up the farm."

This account of appellant, when examined, and which he gave as evidence of a ratification of the contract, amounts to nothing. The offer, according to his own statement, was not made in the presence of young Hoge; and if it, in fact, had been made to his mother, it may be justly inferred, from her evidence afterwards taken, that she would have accepted the offer; and that is made the stronger, from the fact that he withholds the answer of Mrs. Hoge.

But he further alleges, that after appellee arrived at full age, he prevailed upon his mother to sell the land to John Middleton, and the sale was made by his procurement; and, by that sale, he and his mother put it

out of their power to rescind the contract; he having, before that, gone upon the land with his mother, soon after the sale was made to her; and that they continued to live on it and cultivate it for more than one year after he was twenty-one years of age, he managing and controlling the same under a written authority from her, until it was sold by his direction.

Appellant knew, when he went to Wheeling with appellee, that he was a minor—that he distinctly states in his pleading; and he also positively and emphatically denies that he had made any sale or contract *for the sale of the land* and corn before they left for Wheeling, assigning the non-age of appellee as the reason therefor. It becomes important, then, to ascertain from the evidence how the truth is in relation thereto.

J. P. Hill proves he drew the contract for the sale of the land on the 20th of August, 1864, which was signed and delivered by Middleton to Hoge. He also drew the note for the deferred payment for the land, and saw it executed; that he saw the check drawn and delivered for the cash payment for the land and corn, on which the money was received.

Mrs. Hoge proves that the writing evidencing the sale of the land to her son was shown to her at her house in Wheeling; that both parties told her of the sale at the time; that the cash payments had been previously made, and that she paid nothing herself, and had nothing to pay.

Other witnesses prove that they heard appellant say he had sold the land to W. McKay Hoge; and Whitaker proves that Middleton and Hoge both told him the contract for the sale had been made on the 20th of August, 1864; but that they had gone to Mrs. Hoge's residence, in Wheeling, and changed it.

It is, therefore, as certainly established, that the contract for the sale was made with W. McKay Hoge by H. C. Middleton, as any fact can be established by human testimony.   And it is difficult to perceive why the denial was made, unless driven to it by a consciousness of the want of merit in his defense, and the magnitude of the undertaking to sustain it.

But it has been urged, and not without effect, that the sale of the land—one hundred acres for two hundred and twenty dollars per acre—was no speculation—a contract not to be coveted ; and to uphold that position, an examination and estimate of the gold value of the currency, in which the payments were made, is gone into, and the price of the land estimated by the gold standard, ignoring altogether the fact illustrated by the history of that period, and established by the evidence in this cause, that the price of land did not advance with the price of gold, but that sales of real estate were almost universally made for currency, and land could be bought then for about the same price in currency that it had been selling for previously in *par funds*.

But waiving the further consideration of the *evidence* of the value of the property, compared with the price given, I propose to show by the acts of appellant, H. C. Middleton himself, that he regarded the contract of sale most advantageous to himself—a speculation which he was most anxious to realize, and place beyond all contingency.   If this was not so, why was appellant then willing to leave home, travel to Virginia, paying not only his own expenses, but those also of appellee, to substitute Mrs. Hoge as the ostensible vendee, in place of her son ?   The travel to Wheeling involved an outlay of money, doubled, by advancing to his compan-

ion his expenses, and that, too, without knowing certainly whether Mrs. Hoge would permit her name to be used in that way. The trip cost, besides the money, some labor or inconvenience, and loss of time; and the expenses were greater than they would have been by a direct travel to Wheeling, for they went by New York, on an excursion of pleasure, as John W. Middleton proves. That appellant would have incurred so much expense in money and time, to carry out a contract which was neither desirable or profitable, can scarcely be imposed upon the greatest amount of credulity.

But as a further illustration of the efforts to show that the land, in the fall of 1864, was worth twenty-two thousand dollars in currency, and had, in less than two years thereafter, when Hoge sold it, depreciated to fourteen thousand dollars or less, many of the witnesses examined, in the estimates of value, were asked what was the value of the improvements on the land, and then the value of the land, the two estimates added, and the sum thus arrived at fixed as its value. But a fact not to be passed unnoticed in this case is, that the note for the deferred payment of seven thousand dollars, executed by Mrs. Hoge to H. C. Middleton, is not shown by any evidence to have been payable in currency; it is not alleged to have been payable in that way. It was payable, and its payment might have been coerced, in gold, and it was secured by a lien on the land; he got, therefore, the one half of the currency value of his land in that which was equal to *par* funds, and, in addition, got fifteen thousand dollars in currency, showing a clear speculation of the difference between fifteen thousand dollars and seven thousand dollars in currency, according to appellant's own theory.

But when, or from whom, did appellant learn that young Hoge had discovered the fraud in the Quarter-Master's Department in Nashville, and had been paid by the guilty parties not to disclose it? *He knew* the fact, and he also knew that the money which was paid to him for the land was the same that young Hoge got as his reward for keeping "*the matter quiet;*" because he communicated these facts to the mother; but how he learned them, and by whom the money was paid to W. McKay Hoge, is beyond any development in this record.

With this knowledge, how easy would it be for a designing man of sense to use it to his own advantage over an inexperienced youth, with whom he had become intimate, by alluding to the probability of detection, the danger of the loss of the money, and other more serious consequences; and if there was a consciousness of guilt, a desire to secure the money might facilitate the work. But passing by the charge against him, communicated to his mother by appellant, I cannot resist the conclusion, from the evidence as developed, that a fraud in fact was perpetrated on appellee, which no sophistry can conceal, and no rhetoric can palliate, and for which the contract should be rescinded.

But there are other reasons why the judgment of the court below should be approved substantially. It is not disputed or controverted that appellee's disability, under which he labored on the 20th of August, 1864, when he first contracted with appellant and parted with his money, would have been a good ground for setting aside the contract, if it had not been changed, and he had done no act by which he lost that right. When the pretended contract was entered into, in Wheeling, by which his mother was substituted, he was still laboring under the disability of infancy. Up to that time, although he had

parted with a large sum of money, he had the bond of a responsible man for a title to a valuable tract of land. But by the last arrangement he surrendered his bond for a title, and instead thereof, the land was conveyed to a third person, without any consideration or available security to him for the money he had parted with. Having no estate or interest whatever in the land, *as is asserted on behalf of appellant,* he had then been deprived of both money and land.

If there were no other facts in the record, this, of itself, it seems to me, is sufficient to show that there was a power and influence over appellee which he could not resist. The last arrangement placed him in a worse condition than the first, unless it was advantageous to him to give up the money and land to obtain a discharge from the payment of the note of seven thousand dollars for the unpaid purchase mo ey, which I think very probable.

I proceed now to inquire whether appellee has put it out of his power to vacate the contract, by having ratified it after he attained to his majority. That I concede may be done without a formal undertaking or promise to do so.

In *Deason, &c., vs. Boyd & O'Hara* (1 *Dana*, 45), this court held, that a failure for a period of ten years to notify the party of a disaffirmance, and a sale of the thing received in consideration of the contract, after the plaintiff arrived at full age, was a ratification of the contract, and would preclude him from avoiding it. But the court did not regard, or at least did not so declare, that the sale of the thing received was alone sufficient; and in *Parsons on Contracts*, 1 *vol.*, 271, it is said the ratification must be made with the deliberate purpose of assuming a liability from which the party *knows* he is discharged by law, and in nowise

responsible, and it must be directly to the party himself, or his agent. (See, also, authorities referred to in note.)

In 2 *Kent's Commentaries*, 255, *note a*, the doctrine as laid down is: that to give validity to a voidable contract by the ratification of the party, he must be fully apprised of his rights, and do the act deliberately, and upon examination.

In *Tucker vs. Moreland*, 10 *Peters*, 73, Judge Story said, after commenting on an instruction which had been submitted to a jury: "Without undertaking to apply this doctrine to its full extent, and admitting that acts *in pais* may amount to a confirmation of a deed, still we are of opinion that these acts should be of such a solemn and unequivocal nature as to establish a clear intention to confirm the deed after a full knowledge that it was voidable." And this he applied to a deed conveying real estate, showing that he did not regard any difference to exist, whether the contract was executed or merely executory. Many other authorities might be referred to on the same point, but it is deemed unnecessary.

There never has been a direct or expressed confirmation of this contract by W. McKay Hoge; that is not asserted on the part of appellants; but it is contended that he, by his acts and declarations, has ratified it—that it has inferentially been ratified. The original deed from H. C. Middleton to M. A. Hoge is in the record. The date, as originally written, has evidently been changed, as is apparent from the face of the deed; but the indorsement shows it was acknowledged the 1st of April, 1865, but was not left then in the office, and was not lodged for record until the 15th of January, 1867, fifteen days after the summons was exe-

cuted on H. C. Middleton in this case. Where it had been from the 1st of April, 1865, to the 15th of January, 1867, is not explained. John Middleton purchased the land from Mrs. Hoge before the deed was recorded. He knew it was in existence, and I presume knew where it was. But the suit was brought in December, 1866, before the deed was recorded, and in a year and one month after W. McKay Hoge was twenty-one years of age. How long was it before the suit was brought that Hoge had learned that he could avoid the contract after he was twenty-one years of age?

In August, 1866 (the 24th or 25th day), W. C. Whitaker sought an interview with Hoge on the business of a client who had a debt on the latter, which he was anxious to make, and he therefore inquired into Hoge's condition; and having learned the nature of the contract for the land, and the price paid, Whitaker proves he told him the price was a ruinous one, and he thought he could set it aside for fraud. Hoge replied that it could not be done; that Mr. Middleton had taken legal advice how the business should be arranged, and had gone to Wheeling, and had all the papers drawn up in the name of his mother, so as to put it out of *his power* to avail himself of any right that he might otherwise have had to set aside the contract.

J. S. Barrett proves the plaintiff came to him on several occasions, during the summer of 1866, and begged of him to intercede and try to induce the defendant (Middleton) to take the land back, and give up the note. He proposed to take six thousand dollars in cash, and the note Middleton held on his mother, for the land.

It is scarcely credible that he would have begged Barrett to intercede to get the contract set aside at the sacrifice he proposed, if he had known or believed he

could have done it by law, and without the sacrifice. But Whitaker's statement is clear, distinct, and intelligible, to the point that Hoge then did not believe that he could avoid the contract, which he communicated to H. C. Middleton, and he assented to it. Nor is it strange or unreasonble that he should entertain that opinion. He knew appellant had first beguiled him into the contract, then had enticed him to Wheeling, Virginia, under a promise that they would visit the fashionable places of resort in the eastern States, and when they got to Wheeling, the contract was changed into his mother's name, who he knew labored under no disability; and even after the interview with Whitaker, it is morally certain that he believed he was without legal remedy.

It is clear, therefore, that when the acts transpired, and the declarations were made which are claimed to have amounted to a ratification of the contract on the part of W. McKay Hoge, he was not apprised of his legal rights, and that he could disaffirm the contract; and, consequently, is not, and cannot be, precluded thereby.

But it is contended that appellee advised and procured the sale to be made of the land by Mrs. Hoge to John W. Middleton, and that he has put it out of his power to restore the land, and is, on that account, not entitled to the relief he seeks. That objection is easily answered. In an amended petition filed 24th of May, 1867, appellee says defendant, H. C. Middleton, is now the owner, and in possession of said farm, and has been since the pretended sale to John W. Middleton, which was avowedly to John, but was in fact to him, H. C. Middleton. That allegation is not denied. Moreover, Whitaker proves that H. C. Middleton informed him he had canceled the contract for the land. Wharton proves that H. C. Middleton and himself were talking about a trade of real

estate, he to trade Middleton property in Louisville for his, Middleton's, farm, and Middleton told him this property belonged to him. The examiner wrote the statement of two other gentlemen, Messrs. Black and Peacock, as having proved the same fact; but he was so unfortunate as to have misunderstood both of them, as they afterwards stated on oath. The evidence I regard as sufficient without that, however, to establish the fact. But even if he should not be the owner of the land under the last purchase, what would be his condition? I admit the general rule to be, that when an infant arrives at age, and seeks to avoid an executed contract, made while he was an infant, he must restore what he received. But if, as in this case, a party trade with an infant, knowing at the time he is an infant, and afterwards aids, or is instrumental in getting the infant to dispose of the property, he would not be in a condition to demand restoration.

In *Bailey vs. Bamberger* (11 *B. M.*, 113, 115), this court said: "No doubt, if one should take advantage of an infant, or should overreach or defraud him, he would be so guilty of wrong himself that he could not demand a restoration of the consideration received by the infant, before the latter could avoid his contract." In any view of the case, therefore, which I have been able to take, the judgment of the court rescinding the contract for the land is right, and should be *affirmed*.

As to the corn, Finley proves he assisted in gathering and having the corn put in the crib. It was not stripped entirely of the shuck, but was thrown in with part of the shuck on, and all the corn grown in the field was gathered and put in that crib, and he supposed there were about seventy barrels. Montfort proves he measured the crib, and it will hold of shucked corn one hun-

dred and twenty-eight barrels, and if thrown in with part of the shuck on, close snapped, it will hold one fourth or one third less. Steiner, a witness for appellant, proves he helped gather the corn, and it was all put in the crib half shucked, except about one fifth, which was left standing out.

The master, in his last report, fixed the quantity at seventy barrels, and the price at four dollars per barrel, making two hundred and eighty dollars for the corn; and the judgment fixed the value at that sum. But it seems to me, from the repeated affirmations of the plaintiff below to that effect, the corn should have been valued at seven hundred and fifty dollars, and for that alone the judgment should be reversed as to the corn; the difference of value fixed in the petition of appellee, and the amount the judgment was rendered for by the court below.